IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| LORRAINE K. WHITE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 07 C 2539 |
| | ) | |
| CITY OF CHICAGO et al., | ) | Magistrate Judge Sheila Finnegan |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Lorraine K. White charges Defendants City of Chicago and Sergeant Cornelius Brown with excessive force in violation of 42 U.S.C. § 1983, and battery in violation of Illinois state law. On May 7, 2010, the parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and the case is now set for trial on February 28, 2011. Currently before the Court is Plaintiff's motion to strike the expert reports of Dr. Elizabeth S. Kessler and Dr. Mark J. Steinberg. For the reasons set forth here, the motion is granted in part and denied in part, and both experts will be permitted to testify in this case.

## BACKGROUND

On December 14, 2006, Sergeant Brown arrested Plaintiff for attempting to purchase narcotics, a charge Plaintiff denies. Plaintiff claims that after Sergeant Brown placed her in handcuffs, he instructed her to walk up some stairs, slammed her against a wall and caused her face to hit the concrete stairs. Sergeant Brown contends that Plaintiff accidentally fell down in the course of the arrest. In any event, Plaintiff alleges that she sustained multiple injuries as a result of this incident, including pain and swelling to her

mouth and jaw, multiple chipped and/or broken teeth, headaches, seizures, back and neck pain, and extreme emotional distress.

Plaintiff initially indicated that she planned to call four medical treaters at trial: (1) Dr. Neal C. Nealis, a dentist; (2) Dr. Kevin Regan, a chiropractor; (3) Dr. Debra Baines, an emergency room physician; and (4) Dr. Robert K. Erickson, a neurologist. Plaintiff subsequently withdrew Dr. Erickson as a witness, and has decided not to call Dr. Nealis for any causation opinion. (Doc. 142, at 3-4). Defendants deposed Dr. Nealis, Dr. Regan and Dr. Erickson, and have now submitted expert reports to challenge Plaintiff's stated injuries. Specifically, Defendants intend to rely on the opinions of neurologist Elizabeth Kessler, M.D., and dental surgeon Mark Steinberg, D.D.S., M.D., F.A.C.S. Plaintiff seeks to strike both reports for failure to comply with the requirements of Federal Rule of Civil Procedure 26(a)(2)(B). She also argues that the stated opinions are irrelevant, conclusory, speculative, and beyond the expert's qualifications, in contravention of Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). The Court agrees with only some of these arguments, as set forth below.

## DISCUSSION

### I.     Rule 26(a)(2)(B)

Plaintiff first asks the Court to strike Dr. Kessler's and Dr. Steinberg's expert reports because neither complied with Rule 26(a)(2)(B). Expert reports submitted under Rule 26(a)(2) must contain certain information, including:

> (i) a complete statement of all opinions the witness will express and the basis and reasons for them; (ii) the facts or data considered by the witness in forming them; (iii) any exhibits that will be used to summarize or support them; (iv) the witness's qualifications, including a list of all publications authored in the previous 10 years; (v) a list of all other cases in which, during

2

the previous 4 years, the witness testified as an expert at trial or by deposition; and (vi) a statement of the compensation to be paid for the study and testimony in the case.

FED. R. CIV. P. 26(a)(2)(B).  *See also Meyers v. National R.R. Passenger Corp.*, 648 F. Supp. 2d 1032, 1042 (N.D. Ill. 2009), *aff'd*, 619 F.3d 729 (7th Cir. 2010).  "If a party fails to comply with the disclosure and report requirements of Rule 26(a)(2), a district court has the authority to strike the party's expert as a sanction" under Rule 37(c).  *Eagle Servs. Corp. v. H2O Industrial Servs., Inc.*, No. 2:02-CV-36-PRC, 2005 WL 5988646, at *4 (N.D. Ind. Sept. 30, 2005) (citing *McCloughan v. City of Springfield*, 208 F.R.D. 236, 240 (C.D. Ill. 2002)).

Plaintiff notes that when Defendants submitted the expert reports in this case, they did not disclose the compensation being paid to either doctor.  In Plaintiff's view, "the prejudice [from this omission] would be incurable" because "it is simply too late and too close to the looming trial date to begin preparing for the taking of expert-witness depositions."  (Doc. 142, at 20).  Defendants concede that they failed to provide the required compensation statements, but insist that this "was merely an inadvertent oversight."  (Doc. 148, at 3).  Defendants represent that they have now supplied the missing data, and claim that Plaintiff was not prejudiced from the late disclosure since she did not need the compensation statements to effectively depose the expert witnesses regarding their medical opinions.  Plaintiff disagrees, claiming in her reply brief that the real "thrust" of the argument is that "[a]n attorney should not be forced to pay an expert an undisclosed amount of money to take an expert's deposition just so he or she can learn the basis of the expert's opinions."  (Doc. 154, at 3).

On the facts presented, the Court declines to strike either expert report for failure to timely produce compensation statements. The delay in receiving this information did not prevent Plaintiff from deposing the experts concerning their opinions. If Plaintiff desired to know in advance how much each expert would charge for time spent in the deposition, she easily could have asked Defendants to inquire about this. Plaintiff's assertion that she opted not to pursue depositions due to these unknown costs rings hollow.

Plaintiff argues that Dr. Steinberg's report should nonetheless be stricken because the proffered list of cases where he testified as an expert is unreliable. The initial report dated December 23, 2010 disclosed two such cases, but was not signed. On December 28, 2010, defense counsel signed a supplemental list disclosing two additional cases. Finally, on January 27, 2011, Dr. Steinberg signed a list with a total of five cases. Plaintiff contends that she "cannot seriously rely on the accuracy" of this list, which justifies striking the entire report. The Court disagrees.

It is undisputed that Dr. Steinberg asked defense counsel to help him identify cases in which he has offered expert testimony. There was nothing improper about this request, as the 1993 Advisory Committee Notes explain that "Rule 26(a)(2)(B) does not preclude counsel from providing assistance to experts in preparing the reports." Defense counsel was arguably remiss, both in compiling the case list and in failing to obtain Dr. Steinberg's signature until January 27, 2011. *See Salgado by Salgado v. General Motors Corp.*, 150 F.3d 735, 741 n.6 (7th Cir. 1998) (expert report "must be signed by the expert."). Regardless, Dr. Steinberg has now "affirm[ed] and sign[ed] the final list of cases disclosed," and there is no evidence that Defendants' actions resulted in any prejudice to Plaintiff. (Doc. 148, at 4; Doc. 148-1). *See Jenkins v. Bartlett*, 487 F.3d 482, 488 (7th Cir. 2007)

4

(district court properly allowed expert testimony where reports consisted of a letter from counsel, unsigned by the witnesses, summarizing the expected testimony and the basis for that testimony, and the experts subsequently affirmed the contents of the letter by affidavit).  Plaintiff's motion to strike Dr. Steinberg's report based on his expert testimony case list is denied.

In a final effort to strike Dr. Steinberg's report on procedural grounds, Plaintiff objects that the report cites to a 2004 X-ray from Northwestern Hospital which Plaintiff never received.  Defendants insist that the X-ray has been readily available to Plaintiff's counsel through U.S. Legal Support, Inc. since May 4, 2009.  (Doc. 148, at 5; Doc. 148-1, at 10).  In addition, on January 6, 2011, Defendants provided Plaintiff with a courtesy copy of the X-ray.  Plaintiff's counsel does not have the software to view it, but defense counsel have offered to make the X-ray available for viewing or copying at their offices.  (Doc. 148, at 5).  The Court finds that Defendants did not violate Rule 26(a)(2)(B) by failing to attach a copy of the 2004 X-ray to Dr. Steinberg's report.  *McFadden ex rel. McFadden v. Board of Educ. for Illinois Sch. Dist. U-46*, No. 05 C 760, 2009 WL 4544670, at *2 (N.D. Ill. Dec. 1, 2009) (quoting 1993 Advisory Committee Notes) (Rule 26(a)(2)(B) imposes a "duty to *disclose* information regarding expert testimony.") (emphasis added).  Plaintiff has had access to the X-ray for nearly two years, and her motion to strike Dr. Steinberg's expert report based on that record is denied.

## II.    Rule 702 and *Daubert*

The Court next turns to Plaintiff's substantive arguments for striking the expert reports.   Federal Rule of Evidence 702 allows a qualified expert to testify regarding scientific, technical, or other specialized knowledge if it will "assist the trier of fact to understand the evidence or to determine a fact in issue."  *Mason v. City of Chicago*, 631 F. Supp. 2d 1052, 1059 (N.D. Ill. 2009) (quoting FED. R. EVID. 702).  As a threshold matter, the witness must be qualified "as an expert by knowledge, skill, experience, training, or education."  *Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007).   In addition, expert testimony must be "relevant and factually linked to the case in order to meet Rule 702's 'helpfulness' requirement."  *Id.* (citing *United States v. Gallardo*, 497 F.3d 727, 733 (7th Cir. 2007)).   Finally, the testimony must be reliable and not based on subjective belief or speculation.  *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010).  *See also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (quoting *Daubert*, 509 U.S. at 589) (Rule 702 "imposes a special obligation upon a trial judge to 'ensure that any and all scientific testimony or evidence . . . is not only relevant, but reliable.'")

The district court "must act as the gatekeeper" and determine reliability in light of "the proposed expert's full range of experience and training, as well as the methodology used to arrive at a particular conclusion."  *United States v. Pansier*, 576 F.3d 726, 737 (7th Cir. 2009) (citing *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000)).   To be reliable, an expert's opinion must be "well-grounded in methods and procedures of science."  *Winters v. Fru-Con Inc.*, 498 F.3d 734, 742 (7th Cir. 2007).  "[T]he law grants the district court great discretion regarding the manner in which it conducts [a *Daubert*]

evaluation." *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 704 (7th Cir. 2009). In this case, Defendants bear the burden of demonstrating that Dr. Kessler's and Dr. Steinberg's testimony would satisfy the necessary requirements. *Id.* at 705.

## A. Dr. Kessler

Dr. Kessler's expert report offers opinions on several of Plaintiff's medical issues, including: seizures; headaches; neck and back pain; depression; and bruising, contusions, and abrasions. Plaintiff objects that the opinions are irrelevant, conclusory and/or beyond Dr. Kessler's qualifications, and moves to strike the report in its entirety. The Court considers Plaintiff's arguments in turn.

### 1. Seizures

Plaintiff acknowledges that she has a seizure disorder stemming from a 1988 motor vehicle accident, and that she initially intended to seek damages for seizures she suffered after the December 14, 2006 incident. Plaintiff now insists that any opinions relating to that disorder are irrelevant, however, because she "will not make any claim for aggravation of any pre-existing seizure disorder," and "will not call any neurosurgeon to testify at trial." (Doc. 142, at 8). In response to continuing objections from Defendants, Plaintiff has further certified that she "has no intention of introducing evidence of her experiencing seizures after the incident." (Doc. 154, at 2). Plaintiff notes that "[n]o witness will claim [she] suffered a seizure on the day of the incident, and no doctor diagnosed her with having a seizure on the date of the incident." (Doc. 142, at 8).

In light of Plaintiff's stipulation that she will not mention seizures or seek to recover any related damages, the Court agrees that the following opinions from Dr. Kessler are not relevant:

7

(1) "None of Dr. Calimag's[1] office visits, evaluations or treatment was necessitated by the 12/14/06 incident";

(2) The $500 charge for the March 14, 2007 office visit was "grossly in excess of what would be supported by the information in the medical record";

(3) If Plaintiff's July 31, 2010 EEG showed "occasional focal epileptiform activity . . . over the right frontotemporal area," then "it would relate to Ms. White's brain trauma in 1988, not the 12/14/06 incident"; and

(4) "Ms. White also did not have any exacerbation of her pre-existing seizure disorder by the incident."

(Doc. 142, at 8-9). Plaintiff's motion to strike these portions of Dr. Kessler's report is granted.

### 2. Headaches

Plaintiff next seeks to strike any opinions relating to her headaches. She claims that they are tied to her dental injuries and can be separated into two categories: (1) headaches occurring after December 14, 2006 but before her November 2007 dental work; and (2) headaches occurring after the November 2007 dental work. Plaintiff has offered to stipulate that she will not "seek any compensation for headaches sustained after the completion of her initial dental treatment" in November 2007, and claims that this renders all but one of Dr. Kessler's opinions irrelevant. (Doc. 142, at 9). As for that one opinion, Plaintiff argues that it should be barred as conclusory.

### a. Post-Dental Work Opinions

Defendants first object that Plaintiff's post-dental work headaches are relevant notwithstanding her stipulation. Defendants argue that Plaintiff is trying to "present a one-

---

[1] Dr. David P. Calimag is a neurologist who treated Plaintiff after the December 14, 2006 incident.

sided story that all of her headaches were related to the incident and once the dental work was completed, that they went away." (Doc. 148, at 8). Defendants find it "crucial" that Dr. Kessler be allowed to testify regarding all of Plaintiff's headaches, both before and after the December 14, 2006 incident, and before and after her November 2007 dental work, in order to "provide a more accurate picture to the jury." (*Id.*).

Based on her review of the medical records, Dr. Kessler notes that Plaintiff complained of headaches long before the December 14, 2006 incident, stemming from her involvement in two car accidents in 1988 and 2004. (Doc. 142-7, at 6).[2] A little more than a month before the incident, on November 8, 2006, Plaintiff's neurologist, Dr. David Calimag, noted that she reported experiencing occasional headaches that he described as "migraine in nature, which she had before." (*Id.* at 7). Dr. Kessler stresses that when Plaintiff complained of headaches to her chiropractor and an unidentified neurosurgeon (likely Dr. Erickson) following the December 2006 incident, "[n]one of these records indicate that Ms. White developed migraines or had an exacerbation of migraine in the 12/14/06 incident." (*Id.* at 2). Dr. Kessler also finds it significant that though Plaintiff complained of frequent headaches when she saw Dr. Calimag on March 14, 2007, he did not prescribe any related medication at that time, and Plaintiff reported no headaches at all during a subsequent visit on May 16, 2007. Nor was there evidence of recent headaches when Plaintiff saw her chiropractor on August 11, 2007. (*Id.* at 3, 4, 7). As Defendants note, moreover, Dr. Kessler observes that Plaintiff continued to complain of headaches well after the November 2007 dental work was completed. (*Id.* at 5).

---

[2]     Page numbers for this exhibit refer to the pages of Dr. Kessler's report, as opposed to the pages from the docket filing.

The Court agrees that Dr. Kessler's assessment of Plaintiff's headaches before and after both the incident and the dental work is relevant to the issue of damages. Plaintiff is entitled to argue that all of the headaches she experienced from December 14, 2006 through November 2007 were caused by Defendants' actions, and were resolved by the initial round of dental work. Defendants, however, are similarly entitled to offer a contrary, expert opinion that the headaches are unrelated to the incident or to dental issues, as evidenced by their manifestation before the incident occurred and after the dental work was completed. Plaintiff objects that Dr. Kessler fails to explain "how and why the pre-incident and post-incident headaches were the same or even similar in number or intensity." (Doc. 154, at 7). But Dr. Kessler's opinion that none of Plaintiff's headaches relates to the December 2006 incident is not contingent upon any level of frequency or severity. Plaintiff may of course provide testimony regarding how her headaches may have changed or differed following the incident, but this is not a basis for excluding Dr. Kessler's opinions.

Plaintiff insists that the post-dental work opinions are still inadmissible because they are conclusory and void of explanation. Defendants do not directly address this argument, stating only that "Plaintiff's arguments are generally taken out of context and are refuted by a full reading of Dr. Kessler's report." (Doc. 148, at 9). The first opinion at issue relates to Dr. Calimag's May 30, 2008 note stating that Plaintiff reported having "generalized headaches." Dr. Kessler observes that "Dr. Calimag provides no other information" about the headaches, and concludes that "[n]o headaches at that time were due to the incident." (Doc. 142-7, at 5). In a related opinion, Dr. Kessler states that the headaches Plaintiff testified about at her March 9, 2009 deposition "could not be due to the 12/14/06 incident." (*Id.* at 7).

Plaintiff objects that in both cases, Dr. Kessler fails to explain why the headaches are unrelated to the incident.  This argument is belied by Dr. Kessler's detailed analysis of Plaintiff's treatment history following the incident.  She discusses how Plaintiff did not receive any headache medication from Dr. Calimag in March 2007, some three months after the incident, and how she did not complain of any headaches in May or August 2007.  Dr. Kessler also points out that Dr. Calimag's records on the issue are lacking in detail.  As a board certified neurologist, Dr. Kessler is qualified to opine that Plaintiff's course of medical treatment does not support her claim that she suffered headaches as a result of the incident in this case.  Viewing the report in its entirety, Dr. Kessler's opinions are sufficiently detailed to allow Plaintiff "to rebut, to cross-examine, and to offer a competing expert if necessary."  *Metavante*, 619 F.3d at 762 (quoting *Walsh v. Chez*, 583 F.3d 990, 994 (7th Cir. 2009)).

The same cannot be said of Dr. Kessler's third opinion, namely, that "[a]n EEG . . . would not be appropriate study to evaluate headaches."  (Doc. 142-7, at 5).  Dr. Kessler has not provided any basis for this conclusion, and it does not satisfy the requirements of *Daubert* and Rule 702.  The opinion is stricken.

### b.    Pre-Dental Work Opinions

Turning to the one pre-dental work opinion at issue, Plaintiff seeks to exclude Dr. Kessler's statement that Plaintiff's headaches as reported on October 12, 2007 are "not described, with symptoms specified that would be indicative of migraine, but any migraine headaches this long after the incident would be unrelated." (Doc. 142-7, at 4). Plaintiff contends that since the headaches relate to her dental injuries, Dr. Kessler is not qualified to discuss them. Plaintiff stresses that Dr. Kessler is not a dental expert, and objects that she "does not comment on whether unresolved dental injuries can cause headaches." (*Id.*).

The problem for Plaintiff is that this is merely her theory of the case. Plaintiff is entitled to argue that all of the headaches she experienced from December 14, 2006 through November 2007 were caused by her dental injuries. Defendants, however, are similarly entitled to argue, through expert testimony, that the headaches are unrelated to any injuries Plaintiff sustained in the incident. Dr. Kessler concedes that she is not a dental expert and, in that regard, she has not offered an opinion as to the relationship, if any, between Plaintiff's dental injuries and her headaches. Plaintiff may explore that matter on cross-examination. There is no question that Dr. Kessler is qualified to discuss Plaintiff's headaches as a neurological expert, however, and she supports her opinions by referencing Plaintiff's treatment history and medical records. Dr. Kessler's testimony will "assist the trier of fact to understand the evidence or to determine a fact in issue," and will not be excluded under *Daubert* or Rule 702. *Mason*, 631 F. Supp. 2d at 1059.

In sum, Plaintiff's motion to strike Dr. Kessler's opinion relating to the use of an EEG to evaluate headaches is granted. The motion is denied as to all other headache opinions.

### 3.    Neck and Back Pain

Plaintiff next contends that all of Dr. Kessler's opinions regarding her neck and back pain must be stricken as conclusory and lacking in explanation. The Court addresses each below.

### a.    2004 Car Accident

Plaintiff first seeks to exclude references to the chiropractic treatment she received from Dr. Regan following her 2004 car accident. (Doc. 142, at 11). The only specific opinion Plaintiff identifies is Dr. Kessler's statement that at the March 9, 2009 deposition, Plaintiff "reports injuries from the 2004 accident that are not supported by the medical records." (Doc. 142-7, at 7). Plaintiff argues that this opinion is conclusory and irrelevant because the 2004 auto accident is not at issue in this case. The Court disagrees.

Like the headache opinions, Dr. Kessler's neck and back pain opinions trace Plaintiff's condition over time. Dr. Kessler notes, for example, that X-rays of Plaintiff's cervical spine taken on March 23, 2004 showed "diffuse degenerative changes and evidence of the old trauma from the 1988 [car] accident." (Doc. 142-7, at 6). X-rays of Plaintiff's cervical spine taken in January 2007 similarly showed "pre-existing degenerative changes and residua of old trauma at the C3 vertebral body." (*Id.* at 3). In addition, Dr. Kessler observes that a November 17, 2004 EMG showed "minimal signs of denervation in C5, C6 and C7 innervated muscles," and that a March 14, 2007 EMG showed the same "minimal signs of denervation in C5, C6 and C7 innervated muscles." (*Id.* at 3-4, 6). Based on these records, Dr. Kessler opines that Plaintiff's reported neck pain has no physiological

explanation either before or after the incident. (*Id.*). This opinion relates directly to Plaintiff's claim for damages, and will "assist the trier of fact to understand the evidence or to determine a fact in issue." *Mason*, 631 F. Supp. 2d at 1059.

Plaintiff's only response is that Dr. Regan "is not making a physiological opinion; he is merely testifying about her reported pain and her physical limitations." (Doc. 154, at 7). Plaintiff is not required to proffer a physiological opinion, but that does not preclude Defendants from doing so. Dr. Kessler sets forth Plaintiff's medical history and explains why her neck and back pain are unrelated to the December 14, 2006 incident. There is no basis for striking opinions relating to Plaintiff's treatment history dating back to the 2004 car accident.

### b. Chiropractic Treatment

Plaintiff also seeks to exclude Dr. Kessler's opinion that the chiropractic treatment she received following the incident and through March 17, 2007 was unnecessary and unrelated to the incident. Dr. Kessler notes that Plaintiff had been seeing Dr. Regan for many years prior to December 14, 2006. Shortly after the incident, on December 23, 2006, Dr. Regan recorded a "severe flare-up of radicular pains . . . and a prior history of radicular pains bilaterally." In Dr. Kessler's view, however, Plaintiff's pain diagram "does not indicate any radicular distribution." (Doc. 142-7, at 2). Dr. Kessler also discusses the records from Mercy Hospital on December 14, 2006, which showed Plaintiff to be in "mild pain distress" with a supple neck and normal neurological examination. (*Id.* at 1-2). And, as noted, the doctor describes Plaintiff's X-rays and EMG results, along with CT scan reports documenting her physiological condition. (*Id.* at 2). Dr. Kessler's opinion that Plaintiff did

not require chiropractic treatment following the incident is "relevant and factually linked to the case," and is sufficiently reliable to be admitted at trial. *Ervin*, 492 F.3d at 904.

### c. April 2007 MRI

Dr. Kessler opines that Plaintiff's April 29, 2007 MRI gave "no indication of any impingement on any nerve roots or any findings that could account for any of Ms. White's symptoms." (Doc. 142-7, at 4). Rather, the MRI showed "disc-osteophyte complexes at C2-3, C3-4, C4-5, C5-6, C6-7 and C7-T1, consistent with widespread, moderate degenerative changes that pre-existed the 12/14/06 incident." (*Id.*). Plaintiff argues that this opinion "begs the question: Can one not feel pain in the neck or back without having it indicated as an impingement on an MRI scan?" (Doc. 142, at 12). To be sure, Plaintiff may certainly testify that she experienced pain as a result of the December 14, 2006 incident. At the same time, Defendants may present expert testimony that the pain has no physiological basis, and no connection to the incident. Plaintiff objects that Dr. Kessler fails to explain "*why* the MRI findings are inconsistent with the Plaintiff's simple reports of pain." (*Id.*) (emphasis in original). This is inaccurate. Dr. Kessler explains that the MRI showed "moderate degenerative changes that pre-existed the 12/14/06 incident," and no nerve root impingement that would explain Plaintiff's complaints of pain.

Anticipating that the Court would admit this evidence, Plaintiff says that she "would agree to not seek compensation for the second set of chiropractic visits, deeming the opinion irrelevant." (Doc. 142, at 12). It is not entirely clear what Plaintiff means by the "second set" of visits, but it appears that she received treatment from December 23, 2006 through March 17, 2007, and then started another course of treatment on April 7, 2007 and continuing through August 11, 2007. (*Id.* at 11). Defendants do not address this issue, but

15

as noted, they have argued that Plaintiff's neck and back condition must be viewed over time. As explained earlier, the Court agrees. Plaintiff's motion to strike Dr. Kessler's opinion regarding the April 2007 MRI is denied.

### d. Neck Pain in May 2007

Plaintiff next seeks to exclude Dr. Kessler's opinion that "[a]ny neck pain related to the incident would have resolved within days and none of Ms. White's complaints [in May 2007] could be related to the 12/14/06 incident." (Doc. 142, at 12; Doc. 142-7, at 4). Plaintiff views this opinion as conclusory, claiming that Dr. Kessler does not provide any supporting explanation. To the contrary, as noted above, Dr. Kessler states that there was no physiological explanation for Plaintiff's pain, such as nerve root impingement. In addition, Plaintiff made similar complaints of pain following her 2004 car accident, and Dr. Kessler saw no change in her medical records after December 14, 2006 that would explain why the pain did not resolve. Dr. Kessler's opinion "rests on a reliable foundation and is relevant to the task at hand." *Metavante*, 619 F.3d at 760 (quoting *Trustees of Chicago Painters and Decorators Pension, Health and Welfare, and Deferred Sav. Plan Trust Funds v. Royal Int'l Drywall and Decorating, Inc.*, 493 F.3d 782, 787 (7th Cir. 2007)).

### e. Neck Stiffness in March 2009

The last neck and back pain opinion at issue relates to statements Plaintiff made at her March 2009 deposition. According to Dr. Kessler's report, Plaintiff testified that she was experiencing "increased neck stiffness due to the incident, which could not have been more than a few days." (Doc. 142-7, at 7). Plaintiff notes that she "candidly admitted in her deposition that she could not make a claim that the neck stiffness she was experiencing

at the time of the deposition was directly related to the incident." (Doc. 142, at 12-13). She thus reasons that the opinion "concerns a matter not at issue at trial." (*Id.* at 13).

Defendants respond that Plaintiff rebuts this argument "with her own words." (Doc. 148, at 11). Specifically, Plaintiff admits that she seeks "compensation for her treatment with Dr. Regan, and the pain and suffering she experienced during this time period." (Doc. 142, at 13). As noted, Dr. Kessler observed no physiological changes in Plaintiff's neck or back that would explain her reports of pain both before the December 2006 incident and continuing through the date of the deposition. Dr. Kessler then opines that Plaintiff's continuous pain cannot be linked to the incident. This opinion is "relevant and factually linked to the case," and is sufficiently reliable to be admitted at trial. *Ervin*, 492 F.3d at 904.

To summarize, Plaintiff's motion to strike Dr. Kessler's opinions regarding neck and back pain is denied.

### 4. Depression

Dr. Kessler states in her report that "the medical records do not support Ms. White's contention that she suffered from extreme emotional distress as a result of the incident." (Doc. 142-7, at 8). Plaintiff contends that this opinion is conclusory and must be stricken. Defendants respond that Dr. Kessler "provides a clear basis for her opinion" as follows:

> Ms. White states [in her deposition] that in the 12/14/06 incident she sustained injuries to her teeth, headaches, injuries to her eyes, swelling and embarrassment. She states that she had seen no psychiatrist or psychologist since the date of the incident and in none of the medical records is there any indication of anxiety or other psychiatric symptoms related to the 12/14/06 incident.

(Doc. 148, at 11-12 (quoting Doc. 142-7, at 7)).

As Plaintiff notes, "[o]ne does not need to be a psychiatric expert to point to the jury that the plaintiff has not visited a psychiatrist or psychologist as a result of this incident." (Doc. 154, at 8). Dr. Kessler goes a step further, however, suggesting both that the medical records contain no evidence of anxiety or psychiatric symptoms, and that Plaintiff's allegations of extreme emotional distress are unrelated to the incident. As a medical professional with more than 20 years experience both as an attending physician in the Department of Psychiatry at Lovell Federal Health Care Center and as a teacher of psychiatry at Rosalind Franklin University of Medicine and Science, Dr. Kessler is qualified to review Plaintiff's records and explain their contents and significance to a jury.

At the same time, the Court is not convinced that Dr. Kessler is qualified to offer an opinion as to whether Plaintiff in fact suffered any emotional distress following the December 14, 2006 incident. There is no evidence that Dr. Kessler ever examined Plaintiff, and she fails to explain why an absence of mental health treatment or related records demonstrates an absence of emotional problems in this case. Nor does she point to any records confirming a positive mental state. Similarly, Dr. Kessler has offered nothing but a bald assertion that Plaintiff's emotional distress, if it existed, was not caused by the December 2006 incident. This is inadequate. *See Metavante*, 619 F.3d at 761 (an expert "cannot simply assert a 'bottom line.'")

Defendants bear the burden of "establishing that the pertinent admissibility requirements are met by a preponderance of the evidence." *Lewis*, 561 F.3d at 705 (quoting FED. R. EVID. 702, 2000 Advisory Committee Notes). On this record, Defendants have failed to demonstrate that Dr. Kessler's opinions regarding Plaintiff's depression satisfy the *Daubert* standard, and they are stricken.

### 5. Bruising, Contusions, and Abrasions

Plaintiff finally seeks to exclude Dr. Kessler's opinion that "[a]ny abrasions, contusions, or bruises sustained in the incident would resolve within days without any specific treatment," and that "[a]n over-the-counter analgesic could be used initially." (Doc. 142, at 13; Doc. 142-7, at 7).  There are photographs of Plaintiff's bruising from the time she was in the custody of the Chicago Police Department, through her treatment with Dr. Regan, the chiropractor, who took additional photographs of the bruising over time.  (Doc. 142, at 13-14).  Plaintiff argues that in light of this documentation, the length of time such bruising "would be *expected* to last is irrelevant and speculative." (*Id.* at 14) (emphasis in original).

Defendants insist that Dr. Kessler did not need to explain why Plaintiff's bruises "would be resolved within days without treatment" because "bruising, contusing and abrasions are minor injuries by their very nature." (Doc. 148, at 12).  Of course, an expert's report must include all of her opinions, even those a party characterizes as "minor," along with the basis for each opinion.  *See Metavante*, 619 F.3d at 762 (quoting FED. R. CIV. P. 26(a)(2)(B)(i)) (a written expert report must contain "a complete statement of all opinions the witness will express and the basis and reasons for them.")  Contrary to Defendants' assertion, it is not sufficient for Dr. Kessler to provide explanations in a deposition.  The purpose of an expert report is to "provide notice to opposing counsel – before the deposition – as to what the expert witness will testify." *Ciomber v. Cooperative Plus, Inc.*, 527 F.3d 635, 642 (7th Cir. 2008) ("Rule 26(a)(2) does not allow parties to cure deficient expert reports by supplementing them with later deposition testimony.").

Dr. Kessler has not identified any incident that caused Plaintiff to sustain additional bruising or contusions after December 14, 2006, or indicated that some preexisting condition made Plaintiff's bruising last longer than usual. Nor does Dr. Kessler provide any basis for challenging the photographic evidence in this case, or explain why Plaintiff should have used an over-the-counter analgesic. In the Court's view, Dr. Kessler's conclusory assessment that bruising ordinarily resolves within a few days will not "assist the trier of fact to understand the evidence or to determine a fact in issue." *Mason*, 631 F. Supp. 2d at 1059. Plaintiff's motion to strike this opinion is granted.

### B. Dr. Steinberg

Dr. Steinberg has proffered several opinions regarding Plaintiff's dental injuries, including the suspected timing of various chips and fractures. Plaintiff moves to strike these opinions as speculative and improperly based on her credibility. The Court addresses each opinion in turn.

### 1. Fractured Tooth #12

Dr. Steinberg first opines that "Tooth #12 was most likely not involved in the alleged trauma." He notes that an acutely fractured tooth is "very painful," and states that if this injury had occurred on December 14, 2006, Plaintiff "would have been in severe pain and certainly would have brought it to the attention of the ER personnel. Instead, she focused on the three anterior fractured teeth." (Doc. 142-8, at 3). Plaintiff argues that this opinion constitutes mere speculation as to what Dr. Steinberg expected Plaintiff to complain about at the hospital. She also contends that Dr. Steinberg is commenting on her credibility, "doubting her story because she did not notify the ER of every single tooth fracture she may have had on that day." (Doc. 142, at 14).

Dr. Steinberg is qualified to testify that an acutely fractured tooth, such as Tooth #12, is very painful, and that in his professional experience, people suffering from an acutely fractured tooth usually mention that pain upon examination. Dr. Steinberg cannot, and does not express an opinion as to the level of pain Plaintiff actually felt, or her tolerances in that regard. Contrary to Plaintiff's assertion, Dr. Steinberg's opinion is not a mere statement that he does not believe Plaintiff's claim. Rather, he casts doubt on Plaintiff's statements based on his medical experience treating patients with fractured teeth. *Cf. Goodwin v. MTD Products, Inc.*, 232 F.3d 600, 609 (7th Cir. 2000) (district court properly excluded expert "opinion" that he "did not believe" the plaintiff's testimony where "that opinion was merely based on speculation and not on admissible scientific evidence.") Plaintiff's motion to strike this opinion is denied.

### 2. Source of Tooth #12 Fracture

In a related argument, Plaintiff challenges Dr. Steinberg's opinion regarding the actual cause of Tooth #12's fracture. According to Dr. Steinberg:

> "Dr. Nealis is wrong when he said that teeth do not fracture because of teeth grinding or clenching. These are very common causes of tooth fracture. I receive many patients for extraction of cracked/fractured teeth due to clenching and bruxism. Tooth #12 is the only posterior tooth in full occlusion on the left side. This tooth takes the full force of chewing on the left side. It is not surprising that it would crack under these circumstances.

(Doc. 142-8, at 3). Plaintiff claims that this opinion is irrelevant and speculative because Dr. Nealis was testifying about a "vertical" fracture on Tooth #12, which he said is not the type of injury associated with bruxism and was instead caused by blunt force trauma. Dr. Steinberg, in contrast, only opines about fractures in general. (Doc. 142, at 15).

The Court agrees with Defendants that Plaintiff could have explored this issue during a deposition. Dr. Steinberg acknowledges in his report that Dr. Nealis saw Plaintiff in November 2007 "for another consultation for . . . a vertical fracture of #12." (Doc. 142-8, at 2). He also states that in his experience, teeth commonly fracture due to clenching and grinding, and suggests that this would explain the tooth fracture at issue here. Dr. Nealis may disagree, but Dr. Steinberg's analysis is sufficiently detailed to allow Plaintiff "to rebut, to cross-examine, and to offer a competing expert if necessary." *Metavante*, 619 F.3d at 762 (quoting *Walsh*, 583 F.3d at 994).

Plaintiff cannot avoid this conclusion by arguing that "there is no evidence that [she] . . . had problems with clenching." (Doc. 142, at 15). Plaintiff concedes that she did not pursue any dental treatment from at least 1998 to 2007, making Dr. Steinberg's theory of the fracture reasonable, relevant and reliable. Plaintiff's motion to strike this opinion is denied.

### 3.    Pain from Acute Chipped Teeth

Plaintiff charges that Dr. Steinberg makes another improper credibility assessment with respect to the following opinion:

> [A]cute chipped teeth are painful. If the three anterior teeth were chipped on 12/14/06 one would think that the patient would have had the teeth treated much sooner. She was seen on 9/26/2007 by Dr. Nealis for what he called an emergency appointment. Yet no emergency treatment was done. The treatment for the three front teeth and the cracked tooth #12 was done over 6 weeks later on 11/13/2007.

(Doc. 142-8, at 3). As with the opinion regarding Tooth #12, Dr. Steinberg is qualified to testify that acute chipped teeth are painful, and that in his professional experience, people suffering from acute chips usually seek prompt or emergency treatment. He may also

opine that Plaintiff's treatment was not performed promptly or on an emergency basis. Once again, Dr. Steinberg cannot, and does not, comment on Plaintiff's actual pain experience or related tolerances.

Plaintiff argues that Dr. Steinberg's information regarding her treatment is inaccurate, as she testified to seeing two other dentists before Dr. Nealis. (Doc. 142, at 15). Perhaps, but there are no medical records to support this claim, and Dr. Steinberg is entitled to rely on the existing medical documentation in formulating his medical opinion. Plaintiff's motion to strike this opinion is denied.

### 4. 2004 X-ray

Based on his review of the 2004 X-ray from Northwestern Hospital, Dr. Steinberg concludes that "I further doubt that the three anterior teeth were chipped in the alleged trauma on 12/14/2006. . . . [R]adiographs of the c-spine on 3/23/2004 show these chipped teeth. This confirms the emergency doctor's suspicion that the chipped teeth were not new." (Doc. 142-8, at 3). Plaintiff first claims that "it is unclear what the doctor means by the three 'anterior teeth.'" (Doc. 142, at 15). To the extent Plaintiff herself alleges that her three front teeth were chipped in the incident, however, this objection is baseless. Nor is it improper for Dr. Steinberg to characterize the ER doctor as being uncertain regarding the newness of the tooth chips. Records from Mercy Hospital on the date of the incident state, "3 top teeth chipped (? New)." (Doc. 142-8, at 1). Moreover, Dr. Steinberg supports his opinion that the chips were not new by pointing to Plaintiff's 2004 X-ray. Notably, Plaintiff admits that she never saw a dentist from at least 1998 to 2007. (Doc. 148, at 14).

Plaintiff insists that the opinion must nonetheless be excluded because she did not receive a timely copy of the X-ray. The Court has already addressed and rejected this argument. Plaintiff's motion to strike the 2004 X-ray opinion is denied.

### 5. Other Injuries

Plaintiff next seeks to exclude Dr. Steinberg's opinion that aside from the three chipped anterior teeth, which constitute "old injuries," Plaintiff's "other claimed injuries are "unsubstantiated." Dr. Steinberg explains:

> There is no documentation of these injuries in the emergency room records. There is no recorded complaint from the patient stating that she had these injuries or requested attention for these injuries. Patients are seen by multiple practitioners in the emergency department [and] if the patient had such injuries or mentioned that she had other injuries it would have been recorded. Diagnostic tests or treatment would have followed. Post discharge instructions concerning those injuries would also have been given.

(Doc. 142-8, at 3). Plaintiff argues that these statements are conclusory and "comment on the credibility of the Plaintiff." (Doc. 142, at 16).

With respect to the chipped anterior teeth being old injuries, the Court has already concluded that Dr. Steinberg's opinion is relevant, reliable and admissible. As for the "other injuries," Dr. Steinberg is qualified to explain how patients are generally treated in emergency rooms based on his medical expertise, and to distinguish Plaintiff's treatment in this case. Contrary to Plaintiff's assertion, Dr. Steinberg does not comment on her credibility in that regard, but expresses his professional opinion regarding the standard course of care and treatment. The opinion is proper and will not be stricken.

### 6. Opinion Summary

Plaintiff finally challenges Dr. Steinberg's summary paragraph:

I do not feel that the three chipped teeth that the patient complained about in the emergency department were related to her fall on the stairs occurring on 12/14/2006. I feel that they were prior injuries. Cracked tooth #12 is also not related to the incident. Dr. Nealis' comprehensive treatment plan addresses far more than the alleged injury, his plan replaces teeth that were lost over a decade prior to the alleged injury.

(Doc. 142-8, at 3). As explained, Dr. Steinberg has fairly supported and explained these conclusions, which are "relevant and factually linked to the case," and will "assist the trier of fact to understand the evidence or to determine a fact in issue." *Ervin*, 492 F.3d at 904; *Mason*, 631 F. Supp. 2d at 1059. Plaintiff objects to Dr. Steinberg's use of the word "feel," but the context of the report makes it clear that his opinions are based on medical expertise and experience, as opposed to mere subjective belief. Once again, Plaintiff's motion to strike these opinions is denied.

## **CONCLUSION**

For the reasons stated above, Plaintiff's Motion to Strike the Expert Reports of Expert Witnesses Dr. Elizabeth Kessler and Dr. Mark Steinberg [Doc. 142] is granted in part and denied in part. Both experts will be permitted to testify in this case consistent with the rulings set forth in this opinion.

ENTER:

Dated: February 16, 2011

_____
SHEILA FINNEGAN
United States Magistrate Judge